UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LINDA D. TAYLOR                          CIVIL ACTION

VERSUS                                   NUMBER: 05-1930

JO ANNE BARNHART, COMMISSIONER           SECTION:  "M"(5)
OF SOCIAL SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636 (b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 13, 14).

Linda D. Taylor, plaintiff herein, filed the subject application for SSI benefits on November 2, 1999, alleging disability as of November 27, 1992. (Tr. pp. 43-45). In a Disability Report completed by plaintiff on November 1, 1999, she identified the loss of the full use of the left side of her body, particularly the hand and leg, diabetes, and high blood pressure as

the conditions resulting in her inability to work.  (Tr. pp. 46-55).  Plaintiff's application for SSI benefits was denied at the first step of the Commissioner's administrative review process on February 25, 2000.  (Tr. pp. 30-33).  Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on January 10, 2002 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 163-188).  On January 24, 2002, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 19-26).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 3-5).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§1383(c)(3) and 405(g).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1.    [d]efendant ordered a consultative examination without first recontacting the treating physicians as mandated by 20 CFR 404.1512.  Was this error?

2.    [d]efendant ordered a consultative examination without soliciting a treating physician to perform the examination, contrary to 20 CFR 404.1519h.  Was this error?

3.    [d]efendant employed the report of the consultative examination and provided it to the medical expert without

complying the 20 CFR 404.1512(e)(1).  Was this error?

4.   [t]he ALJ rejected the findings of the treating physician without attempting to recontact him to resolve perceived discrepancies, as required by 20 CFR 404.1512(e)(1).  Was this error?

5.   [t]he ALJ rejected the findings of the treating physician without considering the criteria of 20 CFR 404.1527(d)(2).  Was this error?

6.   [t]he ALJ based his rejection of the treating neurologist's findings on errors of fact.  Was this error?

(Rec. doc. 13, pp. 4-5).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.   [c]laimant has not engaged in the performance of substantial gainful activity subsequent to November 2, 1999.

2.   [t]he medical record documents the severe impairments set forth above.  <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p.  However, neither singly nor in combination do these conditions meet or equal the criteria for any impairment set forth in Appendix 1, Subpart P, Regulations No. 4.

3.   [c]laimant is a younger individual, has a 9th grade education background, and has no past relevant work activity.

4.   [t]he assertions of the claimant are clearly exaggerated, are not substantiated by the medical record, lack merit and are not credible to the extent maintained.

5.   [c]laimant has retained a residual functional capacity for light activity subject to the constraints set forth in the hypothet.

6.   [t]he testimony of the vocational expert is credible,

persuasive and in accord with the record evidence.

7.   [t]he premises put to the vocational expert by the undersigned are consistent with the credible evidence at hand.

8.   [t]he vocational evidence demonstrates there are a significant number of jobs in the state and in the nation which claimant can perform.

9.   [c]laimant was not disabled at any time through the date of this decision.

(Tr. pp. 25-26).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:  (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 f.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g).  Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as

4

adequate to support a conclusion.  <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner.  <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

    1.    an individual who is working and engaged in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the evidentiary hearing held on January 10,

2002, plaintiff was forty-seven years of age, had completed nine grades of formal education, weighed 209 pounds, and stood 5'4" tall. She effectively had no past relevant work experience, having chosen to be a homemaker and to care for her children, two of whom, aged seventeen and ten, still lived at home. Plaintiff testified that her mother assisted her with the cooking and cleaning when she was unable to do it. Although she was able to supervise her children getting dressed, plaintiff was not much help because she had limited use of her left hand and problems with standing and walking. As a result of a stroke that she suffered in 1992, plaintiff had been awarded SSI benefits which were later terminated when her husband's income exceeded the requisite threshold. The stroke had affected plaintiff's left side, including the leg, arm, hand, and face, such that she could not comb her hair and had problems dressing herself.

In addition to residuals from the stroke, plaintiff additionally testified to suffering from diabetes, hypertension, and high cholesterol which were monitored every four months and for which she took prescribed medication. After counsel interjected that residuals from the stroke formed the basis for plaintiff's alleged disability rather than the other conditions from which she suffered, plaintiff testified to having difficulty with walking, particularly in cold weather, and of being unable to hold objects

in her left hand.  Her right had would also become problematic from time to time, reportedly due to her high blood pressure or the stroke.  Despite doctor's orders for plaintiff to exercise, she estimated that she could walk only one block, stand for only fifteen to twenty minutes, and sit for thirty minutes before experiencing pain.  Bending was very difficult for plaintiff as was pushing/pulling and reaching.  Plaintiff could lift a broom with her left hand but could not sweep and she could lift a gallon of milk with her right hand.  Aside from supervising her children when they were not at school, plaintiff's daily activities primarily consisted of laying down in bed or propping herself up to watch television.  She was able to put clothes in the washing machine but was unable to fold them afterward.  Upon being questioned by her attorney, plaintiff testified to having slurred speech, drooping on the left side of her face, and a loss of function in her left arm and leg when she became tired.  She could concentrate but experienced memory lapses and then had to rest.  (Tr. pp. 165-184).

Mary Ellen Kelly, a VE, was next to take the stand.  The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was limited to light level work with only occasional crouching, kneeling, climbing, crawling, and balancing and with no rapid movements of the left upper extremity.  In answer thereto, the VE

8

testified that the described individual could function as a light or sedentary level cashier, a light level kitchen worker, or a light level production inspector, with significant numbers of such jobs existing in the state and national economies. To the hypothetical question as originally framed, the ALJ limited the described individual to sedentary level work and no use of the left hand. In answer to the hypo as amended, the VE testified that the described person could still function as a sedentary level cashier but that the number of available positions would be reduced by 70%. Upon being questioned by plaintiff's attorney, the VE maintained that the described individual could still fill one of the reduced number of available cashier positions even if the opinions of Dr. Weisberg, to the effect that plaintiff's left side deficit would interfere with effective ambulation and with the use of the left upper extremity, were credited. (Tr. pp. 184-188).

The medical records admitted in the administrative proceedings below begin with a clinic note from Dr. Leon Weisberg, a Tulane University neurologist, dated November 3, 1995. Dr. Weisberg began his note by summarizing medical records that had been provided to him by an unidentified source. According to those records, plaintiff was seen at the West Jefferson Hospital Emergency Room in July of 1990 for complaints of left-sided weakness, particularly in the upper extremity, and some slurring of speech. A CT scan showed

an abnormality in the right hemisphere which was thought to be due to a cortical ischemic lesion.  Plaintiff's symptoms improved but six months later she presented herself to the Medical Center of Louisiana at New Orleans ("MCLNO") Emergency Room with complaints of left arm and leg weakness, incoordination in the left arm, and slurred speech which were felt to be evidence of a "second stroke syndrome."  Since that time, plaintiff continued to have problems on the left side with weakness and difficulty in using the left arm and having to drag her left leg.  Plaintiff also reportedly had tingling and paresthesias in the left arm and leg, slurred speech, and transient episodes of weakness on the left side which were thought to be due to a change in her blood sugar level.  Dr. Weisberg also reported that plaintiff "... has had a heart attack ... [as well as] intermittent visual disturbances which may be related to high blood pressure."  (Tr. p. 110).

Upon neurological examination, plaintiff rose very slowly from her chair and was noted to drag and circumduct her left leg, showing a moderate degree of motor disorganization in ambulating. Plaintiff could walk only one to two blocks before dragging her left leg.  She could not balance on that leg and had difficulty walking on her heels and toes.  Dr. Weisberg estimated that plaintiff was ambulating at 30% of normal speed and dexterity.  In the left upper extremity, plaintiff could squeeze the doctor's

hand, flex/extend her wrist, flex/extend her forearm, and raise her arm above her shoulder but her ability to perform rapid alternating/rapid successive movements was moderately disorganized. Plaintiff's squeezing strength in the left hand was 40% of normal and the motor disorganization in that extremity was worse than the degree of weakness.   Reflexes were hyperactive on the left side with a Babinski sign present.   Plaintiff had decreased sensation in the left arm and  leg and decreased vibration sets in both ankles which were consistent with a peripheral neuropathy.   She also had left central facial weakness of a very mild degree and no slurring. In summary, Dr. Weisberg believed that plaintiff showed definite evidence of peripheral neuropathy which was symptomatic at that time.   Combined with moderate motor disorganization on the left, activities of her daily living were interfered with.   Plaintiff was able to dress herself at 1/10 the speed that she used to and she walked very slowly and only for two blocks.   Contrary to what he had written earlier, Dr. Weisberg indicated that plaintiff had slightly slurred, but understandable, speech.   He also observed that "[i]n a patient who has had at least two stroke syndromes, the patient has not been placed on any medication which would prevent the development of a recurrent stroke syndrome for which she is at very high risk at this time."  (Tr. pp. 111-112).  Dr. Weisberg believed that plaintiff should be placed on anti-platelet or anti-

coagulation medication to prevent further stroke and that she was showing complications from diabetes in the form of neuropathy and was therefore at greater risk of developing retinopathy was well as nephropathy.  (Tr. pp. 110-113).

The next medical records admitted in the administrative proceedings below were not generated until over three years later when plaintiff was seen at the MCLNO Out-Patient Department on December 15, 1998.  She complained only of occasional headaches, relieved by Tylenol.  Plaintiff was walking for exercise but was not following her diet very well and was only partially compliant with her diabetes medication.  The assessment was hypertension, well-controlled.  Various testing was scheduled and plaintiff was to return to the clinic in three months.  (Tr. pp. 82-83).  A mammogram performed on January 7, 1999 was negative.  (Tr. p. 81).

Plaintiff was feeling "OK" when she was next seen at MCLNO on March 23, 1999.  She denied any chest pain, shortness of breath, or blurry vision.  However, she was not exercising and was not following her diet properly.  The assessment was: 1) hypertension, but plaintiff was not taking her prescribed medication; 2) diabetes, with insulin not being taken correctly; and, 3) hypercholesterolemia, with the use of Lipitor contemplated but not feasible due to financial and compliance issues.  Plaintiff was counseled about the importance of medication compliance, diet, and

exercise to manage her various conditions. (Tr. pp. 78-79). She returned to MCLNO on July 27, 1999 and admitted to sometimes forgetting her nighttime dose of insulin, not adhering to her diet, and not exercising. Plaintiff complained of left shoulder pain on exertion with some shortness of breath but no chest pain. She had 5/5 strength in both right extremities and 4/5 strength in both left extremities. The assessment was poorly controlled diabetes and adequately controlled hypertension. A treadmill stress test was to be scheduled to rule out angina and various medications were prescribed. (Tr. pp. 76-77).

Plaintiff had no complaints when she was next seen at MCLNO on August 27, 1999. She advised medical personnel that she had been walking for exercise and that she was complying with her diabetic/low salt diet. (Tr. p. 75). Plaintiff complained of sharp, intermittent right leg pain, increased with walking, left shoulder pain, and left-sided weakness on November 16, 1999. Her hypertension and diabetes were under control at this time. Medication was dispensed and diagnostic testing was ordered. (Tr. p. 135).

On December 17, 1999, plaintiff was consultatively evaluated by Dr. Miljana Mandich, an internist. Her complaints at the time were diabetes and high blood pressure. Plaintiff related to Dr. Mandich that she had suffered a stroke in 1992 which left her with

13

some residual left-sided weakness in the form of a mild limp, left leg stiffness, and diminished fine manipulation in the left hand. Her daily activities consisted of household chores, resting, and watching television.  On physical examination, plaintiff mildly favored her left leg while ambulating but with no dragging or foot drop.  The spine and back were completely normal but plaintiff complained of some soreness in both hips and across the lower back with forward flexion and reversal.  Plaintiff was briefly able to walk on her toes and heels and straight leg raising was negative. No abnormalities of the bones, joints, or muscles were noted. Plaintiff had grossly equal muscle bulk, tone, and strength in all extremities and the left calf was only ½ inch thinner in circumference than the right, possibly normal for a right-handed person like plaintiff.  Sensation was intact and there were no abnormalities of coordination or involuntary movements. Plaintiff's gait was slightly abnormal in that she had a tendency to hold her left knee stiff while walking and therefore had to lift it higher to avoid shuffling.  An electrocardiogram was normal. Dr. Mandich's diagnosis was:  1)  hypertension, well-controlled with medication; 2) insulin-dependent diabetes mellitus of adult onset; and, 3) history of a stroke in 1992 with slight residual stiffness of the left leg and subjective feelings of diminished fine coordination of the left hand.  (Tr. pp. 84-92).

14

On January 31, 2000, an Administration consulting physician reviewed the medical records then extant and determined that plaintiff retained the residual functional capacity for light level work with climbing to be done only occasionally and the work to be performed away from concentrated exposure to extreme temperatures. (Tr. pp. 93-104).

Plaintiff presented herself to the MCLNO Emergency Room on February 11, 2000 with complaints of left arm, upper chest, and shoulder pain for the previous three months, worse on exertion and described as a dull ache, which radiated to her left jaw and was associated with numbness in the jaw and neck and shortness of breath.   The impression was chronic left shoulder pain, hypertension, and diabetes.   Testing was scheduled and plaintiff was directed to continue on her mediation regimen.   (Tr. pp. 128-131).    X-rays of the chest revealed no evidence of acute cardiopulmonary disease.   (Tr. p. 132).   While an ECG done on February 11, 2000 produced abnormal results, the results were normal when plaintiff was re-tested the following day.   (Tr. pp. 134-133).   Also on February 11, 2000, another Administration reviewer concluded, on the basis of the residual functional capacity assessment performed on January 31, 2000, that plaintiff was capable of light level work and that Rule 202.17 of the Medical-Vocational Rules dictated a denial of plaintiff's

15

application for Social Security benefits.  (Tr. p. 70).

Plaintiff's condition was monitored when she was next seen at MCLNO on February 22, 2000.  No specific complaints from plaintiff are documented on the progress note.  The examiner did observe that plaintiff had weakness in the left lower and upper extremities but sensation was grossly intact.  The assessment was diabetes mellitus and status post cardiovascular accident ("CVA").  Plaintiff's hypertension and diabetes medication were adjusted and Ultram was additionally prescribed for plaintiff's "chronic pain."  She was also re-started on Lipitor which she had taken for a time but then stopped.  (Tr. p. 127).

Plaintiff underwent a gynecological evaluation at MCLNO on March 21, 2000.  (Tr. pp. 125-126).  She had no complaints when she was seen at MCLNO three days later.  Instructions were given to her on diet, medication compliance, weight loss, and insulin administration.  Plaintiff was also referred to the diabetic nurse practitioner and her insulin was adjusted.  (Tr. pp. 124, 161).

On May 26, 2000, plaintiff was seen for a second time by Dr. Weisberg.  He estimated that plaintiff was ambulating and had dexterity of approximately 30% of normal on the left side. Plaintiff reportedly had difficulty dressing herself, combing her hair, cutting her food, or using her left hand for a support function and she could not lift objects more than seven pounds with

16

that extremity.  In addition, plaintiff had numbness and tingling in both legs due to peripheral neuropathy secondary to diabetes. On  neurological examination, plaintiff dragged and circumducted her left leg, had a spastic left hemiparesis, and had a broad-based unsteady gait with a positive Romberg sign.  Objects more than five pounds could not be lifted and plaintiff had pain over the shoulder region.  Plaintiff had decreased rapid alternating and rapid successive movements in both left extremities.  Ankle jerk reflexes were diminished bilaterally and knee jerk reflexes were diminished bilaterally.  Sensation was decreased in both legs and plaintiff had a left hemisensory deficit.  Coordination was also poor in the left arm and leg and plaintiff had a left central facial weakness. She had pain over the left shoulder with pain on external rotation of the region.  Dr. Weisberg's assessment was a moderate degree of motor disorganization on the left.  Plaintiff was felt to be incapable of lifting twenty pounds with her left arm, could stand no more than fifteen to twenty minutes, and had marked difficulty with squatting, kneeling, and bending.  In his opinion, plaintiff was "... not capable of living independently because of the physical impairment that she ha[d] secondary to the peripheral neuropathy and the stroke syndrome which are a consequence of the diabetes, the hypertension and the elevated cholesterol. (Tr. pp. 106-109).

17

Plaintiff returned to MCLNO on August 22, 2000 for further monitoring. No complaints were voiced by her at that time. Plaintiff's medications were adjusted and she was to return to the Clinic in two to three months. (Tr. pp. 158-159). On December 19, 2000, it was noted that plaintiff was not compliant with her medications. Once again, her medications were adjusted and testing was scheduled. (Tr. pp. 153-155). Pursuant to that action, plaintiff underwent a mammogram on February 16, 2001 which was negative. (Tr. p. 152). Plaintiff's biggest problems when seen on April 2, 2001 were back and low back pain. Motor strength was 5/5 on the right and 4 to 4+/5 on the left with a "give away" type of pattern. Sensation was diminished on the left side of the face, arm, and leg but the pattern was spotty and inconsistent. Although plaintiff brought with her a standardized form supplied by her attorney that was designed to elicit the doctor's opinion on plaintiff's ability to engage in work-related activities, the record contains no such completed form. (Tr. pp. 150-151).

On April 17, 2001, plaintiff returned to MCLNO for follow-up care. She complained of numbness in the left arm and pain to the back of the neck and left leg. Plaintiff had no chest pain, shortness of breath, or abdominal pain. The assessment was hypertension, under good control, diabetes, and hypercholesterolemia. Plaintiff's medications were adjusted and

18

testing was scheduled.  (Tr. p. 149).  The final treatment note appearing in the record documents plaintiff's return to MCLNO on October 23, 2001.  Her hypertension was declared to be well controlled but her diabetes  was poorly controlled due to non-compliance.  Plaintiff's cholesterol level was also poorly controlled secondary to her being able to afford the necessary medication.  Once again, plaintiff's medications were adjusted and a lipid profile was ordered to  be done before plaintiff's next scheduled return to MCLNO in two to three months.  (Tr. pp. 147-148).

As noted earlier, plaintiff challenges the Commissioner's decision to deny SSI benefits on six grounds.  First, she complains that the ALJ ordered a consultative evaluation without  first recontacting one of her treating physicians, Dr. Weisberg, in violation of 20 C.F.R. §404.1512(e)(1).  Second, plaintiff alleges that the ALJ ordered a consultative evaluation of her without soliciting a treating physician to perform the exam as required by 20 C.F.R. §404.1519h.  Third, plaintiff contends that the ALJ erred in obtaining a report of the consultative evaluation and providing it to a "medical expert" without complying with §404.1512(e)(1).  Fourth, plaintiff alleges that the ALJ rejected the opinions of Dr. Weisberg without attempting to recontact him to resolve any perceived discrepancies as required by §404.1512(e)(1).  Fifth,

plaintiff complains that the ALJ rejected the findings of Dr. Weisberg without considering the criteria of §404.1527(d)(2). And sixth, plaintiff contends that the ALJ based his rejection of Dr. Weisberg's findings on errors of fact. (Rec. doc. 13, pp. 4-5).

Initially, the Court notes that plaintiff complains of alleged violations of the Commissioner's rules appearing in Part 404 of Title 20 of the Code of Federal Regulations. However, those regulations pertain to the processing of applications for federal old-age, survivors, and disability insurance benefits. The analogous rules governing the handling of applications for SSI benefits like the one filed by plaintiff can be found in Part 416 of Title 20 of the Code of Federal Regulations. Be that as it may, plaintiff's first four claims are procedural in nature and are related. They will thus be addressed together. In doing so, the Court is guided by the pronouncements of the United States Court of Appeals for the Fifth Circuit in <u>Morris v. Bowen</u>, 864 F.2d 333 (5th Cir. 1988), as follows:

> [t]he duty of an appellate court when reviewing an agency decision regarding disability benefits and supplemental security income benefits is not to reweigh the evidence, but merely to determine if there is substantial evidence in the record to support the agency's decision. Moreover, procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected. The procedural improprieties alleged by Morris will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence

of substantial evidence to support the ALJ's decision.

> Id. at 335 (quotations, citations, and brackets omitted).

Social Security law imposes certain duties on both of the parties to the administrative proceedings.  With respect to the claimant, 20 C.F.R. §416.912(a) provides, in pertinent part, as follows:

> ... you have to prove to us that you are blind or disabled.  This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairments.

Title 20 C.F.R. §416.912(c) further provides that:

> [y]ou must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled.

And, as noted earlier, the claimant bears the ultimate burden of proving that she is disabled.  Harrell, 862 F.2d at 475.

Among the duties imposed upon the ALJ is that of fully and fairly developing the facts relating to a claimant's application for Social Security benefits.  Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995).  In that regard, the applicable portion of §416.912 provides that:

> [b]efore we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began

less than 12 months before you filed your application for
benefits.  We will make every reasonable effort to help
you get medical reports from your own medical sources
when you give us permission to request the reports.

§416.912(d).

Relevant to the matter at hand are the following pertinent

portions of §416.912:

(e)   *Recontacting medical sources.*   When the
evidence we receive from your treating physician or
psychologist or other medical source is inadequate for us
to determine whether you are disabled, we will need
additional information to reach a determination or a
decision.  To obtain the information, we will take the
following actions.
(1)  We will first recontact your treating physician
or psychologist or other medical source to determine
whether the additional information we need is readily
available.   We will seek additional evidence or
clarification from your medical source when the report
from your medical source contains a conflict or ambiguity
that must be resolved, the report does not contain all
the necessary information, or does not appear to be based
on medically acceptable clinical and laboratory
diagnostic techniques.  We may do this by requesting
copies of your medical source's records, a new report, or
a more detailed report from your medical source,
including your treating source, or by telephoning your
medical source.  In every instance where medical evidence
is obtained over the telephone, the telephone report will
be sent to the source for review, signature and return.
(2)   We may not seek additional evidence or
clarification from a medical source when we know from
past experience that the source either cannot or will not
provide the necessary findings.
(f)   *Need for consultative examination*.   If the
information we need is not readily available from the
records of your medical treatment source, or we are
unable to seek clarification from your medical source, we
will ask you to attend one or more consultative
examinations at our expense.   See §§416.917 through
416.919t for the rules governing the consultative

22

examination process.  Generally, we will not request a
consultative examination until we have made every
reasonable effort to obtain evidence from your own
medical sources.  However, in some instances, such as
when a source is known to be unable to provide certain
tests or procedures or is known to be nonproductive or
uncooperative, we may order a consultative examination
while awaiting receipt of medical source evidence.  We
will not evaluate this evidence until we have made every
reasonable effort to obtain evidence from your medical
sources.

The Regulations further provide that the decision to have a
claimant submit to a consultative evaluation is made on a case-by-
case basis.  20 C.F.R. §416.919.  Such an evaluation may be used to
secure needed medical evidence the file does not contain.  20
C.F.R. §416.916a(a)(2).  The practitioner who is selected to
perform the consultative evaluation may be a claimant's own
physician or another doctor, 20 C.F.R. §416.919g(a), and although
a treating physician is ordinarily the preferred person to conduct
the evaluation, the Regulations give the Commissioner some degree
of discretion in choosing a physician to perform the task.  20
C.F.R. §§416.919h, 416.919i.

The seemingly mandatory language of §416.912(e) and (f)
notwithstanding, that is not the end of the inquiry.  Reversal of
the Commissioner's decision for a violation of §416.912 is
appropriate only if the claimant shows prejudice from the ALJ's
failure to request additional information.  <u>Newton v. Apfel</u>, 209
F.3d 448, 458 (5th Cir. 2000).  "'Prejudice can be established by

showing that additional evidence would have been produced if the ALJ had fully developed record, and that the additional evidence might have led to a different conclusion.'" Id. (quoting Ripley, 67 F.3d at 557 n. 22). It also bears repeating that the responsibility of weighing and resolving conflicts in the evidence, including the opinions of treating and examining physicians, lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991).

As noted earlier, plaintiff's application for SSI benefits was formally filed on November 2, 1999. In a Disability Report - Field Office form completed on that same date, an Administration employee who interviewed plaintiff observed that plaintiff "walked slowly + left leg was stiff" but no other perceived limitations were noted. (Tr. p. 58). In a Disability Report that she had completed on November 1, 1999, plaintiff identified MCLNO as the only healthcare provider or facility where she had been treated. (Tr. pp. 49-52). In response to a specific question on the Report which asked if "... anyone else ha[d] medical records or information about your illnesses, injuries or conditions...," plaintiff answered in the negative. (Tr. p. 51). Acting on plaintiff's identification of MCLNO as her sole healthcare provider, on November 3, 1999 the Commissioner requested

24

plaintiff's medical records from that facility from November 1, 1998 to the date of plaintiff's last visit there.  (Tr. p. 74).

Plaintiff's MCLNO records from December 15, 1998 to August 27, 1999 were received by the Administration on November 12, 1999. (Tr. pp. 74-83).  During that time period, plaintiff had visited MCLNO five times.  She complained only of occasional headaches and reported walking for exercise but not being compliant with her diabetes medication on December 15, 1998.  The diagnosis was hypertension, well-controlled.  A mammogram performed on January 7, 1999 was negative.  Plaintiff was doing "OK" on March 23, 1999 but was not exercising, following her diet, or being medication compliant.  Plaintiff was still non-compliant on July 27, 1999 at which time she complained of left shoulder pain on exertion with shortness of breath but no chest pain.  Strength was 5/5 on the right and 4/5 on the left.  The diagnosis was poorly controlled diabetes and adequately controlled hypertension.  Plaintiff had no complaints when seen at MCLNO on August 27, 1999.  She was walking for exercise and reported being diet compliant at that time.  In none of the foregoing MCLNO records did medical personnel impose any limitations on plaintiff or offer any opinions on her ability to engage in daily or work-related activities.

In a Disability Supplemental Interview Outline that she completed on November 8, 1999, plaintiff indicated that she

prepared her own meals, performed household maintenance, including laundry and general cleaning, and shopped as needed.[1]/  Plaintiff complained of sharp right leg pain, increased with walking, left shoulder pain, and left-sided weakness when she was next seen at MCLNO on November 16, 1999.  The diagnosis was hypertension and diabetes, under control.  Once again, no limitations were imposed and no opinions were offered on plaintiff's abilities.

On December 17, 1999, plaintiff was consultatively evaluated by Dr. Mandich.  The reason(s) for the selection of Dr. Mandich as the consultative evaluator, whether it was because of past unfavorable dealings between MCLNO and the Administration or simply because the MCLNO records contained no meaningful information on plaintiff's ability to engage in work-related activities, is not apparent from the record.  After performing a thorough evaluation, Dr. Mandich rendered the following diagnosis:  1) hypertension, well-controlled with medication; 2) insulin-dependent diabetes of adult onset; and, 3) a history of stroke in 1992 with slight residual stiffness to the left leg and subjective feelings of diminished fine coordination in the left hand.

After reviewing plaintiff's file, which contained the various

---

[1]/  Reports such as these may properly be considered by the ALJ in determining plaintiff's disability status.  Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995); Villa, 895 F.2d at 1022-23.

report forms she had completed as well as the medical records from MCLNO and Dr. Mandich, on January 31, 2000, an Administration medical consultant determined that plaintiff retained the residual functional capacity to perform a limited range of light work. Plaintiff then returned to MCLNO on February 11, 2000 with complaints of left arm, upper chest, and shoulder pain for the previous three months even though no mention of those symptoms was made to Dr. Mandich when she evaluated plaintiff on December 17, 1999. Also on February 11, 2000, a second Administration medical consultant reviewed the records then extant and determined that plaintiff was capable of light level work. Plaintiff voiced no specific complaints when she was next seen at MCLNO on February 22, 2000. The examiner did note weakness in the left extremities but sensation was grossly intact. The diagnosis was diabetes and status post cardiovascular accident. On February 25, 2000, plaintiff's request for SSI benefits was denied at the first step of the Commissioner's administrative review process. Gynecological care was administered to plaintiff on March 21, 2000. She had no complaints when she returned to MCLNO on March 24, 2000. Her medications were adjusted and she was instructed on diet, medication compliance, and weight loss.

On April 10, 2000, plaintiff's attorney corresponded with the Commissioner and, _inter alia_, requested a copy of the report of Dr.

Mandich and asked that he be contacted prior to the scheduling of any further consultative evaluations so that a treating physician might be selected to perform the evaluation as required by 20 C.F.R. §404.1519h.  (Tr. pp. 34-35).  The treating physician to which counsel was referring is not identified.  On May 1, 2000, plaintiff executed the Administration's standardized form for requesting a hearing de novo before an ALJ.  (Tr. pp. 38-39). There, for the very first time, plaintiff identified Dr. Weisberg as one of her treating physicians. (Id.).  Plaintiff was subsequently seen by Dr. Weisberg on May 26, 2000 who opined that she suffered from a moderate degree of motor disorganization on the left and was not even capable of living independently.

Plaintiff returned to MCLNO approximately three months later on August 22, 2000.  She had no complaints at this time.  The only action that was taken was that plaintiff's medications were adjusted and she was instructed to return to the clinic in two to three months.  Plaintiff was non-compliant with medications on December 19, 2000 and a mammogram performed on February 16, 2001 was negative.  She complained of back pain on April 2, 2001.  Motor strength was 5/5 on the right and 4 to 4+/5 on the left with a "give way" pattern but no reports of plaintiff falling.  Plaintiff also had diminished sensation on the left but the pattern was inconsistent.  Although plaintiff presented the examiner with a

28

form that had been supplied to her by her attorney that was geared to eliciting opinions regarding her ability to engage in work-related activities, MCLNO personnel failed or refused to complete the form.

On April 17, 2001, plaintiff returned to MCLNO with complaints of left arm numbness and pain to the back of the neck and the left leg.  The diagnosis was hypertension, under good control, diabetes, and high cholesterol.  Plaintiff's medications were adjusted and testing was scheduled.  On June 21, 2001, plaintiff executed the prescribed form authorizing the release of her medical records. (Tr. p. 116).  Armed with that signed authorization, the Administration promptly made demand upon Dr. Weisberg for a copy of plaintiff's medical records and upon MCLNO for any additional medical records.  (Tr. pp. 105, 119).  Plaintiff's records from Dr. Weisberg, including his report of November 3, 1995, and from MCLNO were received by the Administration in July of 2001.  (Id.). Plaintiff was seen one final occasion at MCLNO on October 23, 2001 at which time her hypertension was said to be well-controlled and her diabetes was characterized as poorly-controlled secondary to non-compliance.  Subsequent to the administrative hearing and the issuance of the ALJ's unfavorable decision, the AC invited plaintiff to submit any new and material evidence which she wished to have considered.  (Tr. pp. 16-17).  Plaintiff's counsel

submitted a memorandum in support of his request for review of the ALJ's decision on March 24, 2003. (Tr. pp. 6-15). Unpersuaded by counsel's arguments, the AC denied plaintiff's request for review on April 1, 2005.

As the foregoing chronology of events demonstrates, it was some six months after plaintiff's application for SSI benefits was filed before she identified Dr. Weisberg as one of her treating physicians. By that time, plaintiff's MCLNO records had already been requested by the Administration and she had already been consultatively evaluated by Dr. Mandich. While plaintiff argues that the ALJ should have "re-contacted" Dr. Weisberg to obtain supplemental information and should have also solicited Dr. Weisberg to perform the consultative evaluation, the Commissioner cannot be charged with knowledge of information that she requests but which a claimant fails to furnish. See 20 C.F.R. §416.916. It was also not until June 21, 2001 that plaintiff executed the form authorizing the release of her records from Dr. Weisberg which the Administration promptly acted upon. Plaintiff makes no forceful argument that the Commissioner should have re-contacted her MCLNO doctors for further information or solicited those physicians to conduct the consultative evaluation which would have arguably been a more logical choice given the frequency of treatment that they rendered to plaintiff. See 20 C.F.R. §416.927(d)(2)(i). However,

30

the Court also notes that MCLNO personnel failed or refused to complete the residual functional capacity assessment form plaintiff presented to them on April 2, 2001.  There is thus little reason to believe they would have been more cooperative in providing further information on plaintiff's capabilities or performing a consultative evaluation.  On the facts presented here, the ALJ did not err in failing to elicit more information from Dr. Weisberg or in failing to solicit him to perform the consultative evaluation early on in the administrative proceedings.  Moreover, insofar as plaintiff was never precluded from supplementing her record with additional reports from Dr. Weisberg, any error flowing from the procedural improprieties complained of was harmless.  See Fink v. Barnhart, 123 Fed. Appx. 146, 148 (5th Cir. 2005).  And contrary to plaintiff's contention, no medical expert as defined in 20 C.F.R. §416.927(f)(2)(iii) was used in plaintiff's case.

Like any other Social Security proceeding, the ALJ in the present case was called upon to weigh and reconcile medical reports from a number of physicians.  At one end of the spectrum were plaintiff's MCLNO medical records which contained no restrictions on her activities and primarily documented the management of her hypertension, diabetes, and high cholesterol through medication, diet, and exercise.  At the other end of the spectrum are Dr. Weisberg's two reports, issued five years apart, which gave no

31

indication that he treated plaintiff in any fashion but which concluded that she was not even capable of living independently. Yet when plaintiff was seen by MCLNO immediately preceding and following her evaluation by Dr. Weisberg on May 26, 2000, she had no complaints and there was nothing reported by the examiner that would approach the level of debilitation suggested by Dr. Weisberg. In fact, approximately six months prior to Dr. Weisberg's second examination of plaintiff, she herself reported that she could prepare her own meals, perform household maintenance, and shop. Between those two extremes is the report of Dr. Mandich in which she concluded that plaintiff's history of a stroke left her with only slight residual stiffness in her left leg and subjective feelings of diminished fine coordination in the left hand.[2]/ Such " ... conflicts in the evidence, including medical opinions, are to be resolved by the ... [Commission], not by the courts." <u>Patton</u>, 697 F.2d at 592.

While plaintiff complains that the ALJ should have re-contacted Dr. Weisberg to resolve any perceived discrepancies in his reports, she later argues, somewhat incongruously and under the rubric of her sixth challenge to the Commissioner's decision, that

---

[2]/  Because the record contains the report of Dr. Mandich, an examining physician, the ALJ was not required to perform the detailed analysis required by 20 C.F.R. §416.927(d)(2) which forms the basis of plaintiff's fifth claim for relief.  <u>Newton v. Apfel</u>, 209 F.3d 448, 453 (5th Cir. 2000).

the ALJ should have found that she was disabled under Section 11.04 of the Listing of Impairments on the basis of Dr. Weisberg's reports alone.  Those reports were either sufficient on their face or they were not.  Suffice it to say that the record as a whole does not contain evidence of significant and persistent motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 11.04(B).  Procedural perfection in administrative proceedings is not required.  <u>Mays</u>, 237 F.2d at 1364.  The errors cited by plaintiff do not call into doubt the existence of substantial evidence that plaintiff was not disabled within the meaning of the Social Security Act.

<b><u>RECOMMENDATION</u></b>

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that the defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

33

consequences will result from a failure to object.  <u>Douglass v.</u>

<u>United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this  20th  day of _____June_____,

2006.

_____

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

34